1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MANUEL LARA,

11          Plaintiff,                    No. 2:07-cv-2523 MCE KJN P

12        vs.

13   DR. V. DUC, et al.,

14          Defendants,              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.    Introduction

17          Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  Pending before the court is the motion for summary judgment filed by

19   defendants Duc and Lampkin.  (Dkt. No. 54.)  Plaintiff filed an opposition on October 8, 2010.[1]

20   (Dkt. No. 59.)  Defendants filed a reply on October 13, 2010.  (Dkt. No. 61.)  As explained more

21   fully below, the court recommends that defendants' motion for summary judgment be granted.

22   II.   Allegations

23          This case is proceeding on the amended complaint, filed January 5, 2009.  (Dkt.

24   _____

25        [1] On October 21, 2010, plaintiff filed a duplicate opposition and statement of disputed facts.  (Dkt. Nos. 63-65.)  The accompanying declaration states that plaintiff submitted extra copies of his opposition and statement of disputed facts to his mother for separate mailing to the
26   court in case his initial filing was not timely received.

No. 23.)  Plaintiff alleges that Dr. V. Duc and Correctional Officer Lampkin were deliberately indifferent to his serious medical needs because Dr. Duc refused to provide plaintiff with a medical hold preventing plaintiff's transfer to a different institution, and Officer Lampkin refused to inquire whether plaintiff should have a medical hold in light of his recent eye surgery and failed to insure plaintiff's medications and eye patches were transported with him to the new institution, allegedly ultimately resulting in another detachment of plaintiff's retina and loss of eyesight.

III.   Motion for Summary Judgment

Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56(c) is met.  "The judgment sought should be rendered if . . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id., citing Fed. R. Civ. P. 56(c).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

1    as whatever is before the district court demonstrates that the standard for entry of summary

2    judgment, as set forth in Rule 56(c), is satisfied."  Id.

3              Consequently, if the moving party meets its initial responsibility, the burden then

4    shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

5    See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

6    to establish the existence of such a factual dispute, the opposing party may not rely upon the

7    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

8    form of affidavits, and/or admissible discovery material in support of its contention that such a

9    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

10   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

11   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

13   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

14   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

15   1436 (9th Cir. 1987).

16             In the endeavor to establish the existence of a factual dispute, the opposing party

17   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

18   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

19   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

20   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

21   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

22   committee's note on 1963 amendments).

23             In resolving a summary judgment motion, the court examines the pleadings,

24   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

25   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

26   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

3

court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By order filed January 18, 2008, the court advised plaintiff of the requirements for

opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt.

No. 10); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

Eikenberry, 849 F.2d 409 (9th Cir. 1988).

IV.     Undisputed Facts

The following undisputed facts ("UDF") are either not disputed by plaintiff or

defendants, or, following the court's review of the evidence submitted, have been deemed

undisputed:

1.  At the time the instant allegations occurred:

a.  Plaintiff was a California prisoner housed in Facility C at the California

State Prison – Sacramento.

b.  Defendant Lampkin was a floor correctional officer, and defendant Dr.

Duc was a physician; both defendants were employed at California State Prison – Sacramento.

2.  Plaintiff was hit in the right eye with a rock when he was about five years old,

which plaintiff recalls caused hemorrhaging.  (Dkt. No. 54 at 13.)  Dr. Park opined that previous

eye trauma can predispose a patient like plaintiff to cataracts and early onset of retinal

detachments.  (Dkt. No. 54-5 at 75-76.)

3.  In 2002, plaintiff had cataract surgery for blurred vision in his right eye.  (Dkt.

No. 54-4 at 15-16.)  Dr. Park stated that "having had cataract surgery . . . may put you at a slightly increased risk for another recurrent retinal detachment."  (Dkt. No. 54-5 at 74.)

4.  Plaintiff was nearsighted and began wearing glasses when he was five years old. (Dkt. No. 54 at 14.)  Plaintiff has lattice retinal degeneration in both eyes.  (Dkt. 54-5 at 75.)  Although Dr. Park was unaware that plaintiff was nearsighted, Dr. Park opined that "lattice retinal degeneration tends to be more common in people who are very nearsighted."  (Id.)

5.  On October 18, 2005, a classification committee reviewed plaintiff's program.  Before the hearing, plaintiff had asked to be transferred to Calipatria State Prison.  The committee recommended plaintiff's transfer to Calipatria State Prison or the California State Prison – Los Angeles County because of population pressures, and referred plaintiff to a classification services representative for approval of the transfer.

6.  On October 25, 2005, plaintiff noticed his vision was blurry and thought that the cataract in his right eye might be coming back, but plaintiff was not concerned because he could still see.

7.  On October 26, 2005, a classification services representative approved plaintiff's transfer to Calipatria State Prison.

8.  The morning of October 26, 2005, plaintiff woke up seeing black spots with no vision at all in his right eye.

9.  Plaintiff went to the Facility C medical clinic and told a nurse he could not see out of his eye.  Plaintiff was taken to see Dr. Duc who had plaintiff rushed to the University of California Medical Center – Davis Medical Center ("UCDMC").

10.  At UCDMC, plaintiff was seen by Dr. Park, a Board-certified ophthalmologist.  Plaintiff complained of blurry and hazy vision in his right eye since the previous evening that had worsened in the morning, that he saw "bubbles," and had only a small window of vision in that eye.  Plaintiff had no pain, and had not experienced any trauma.  Dr. Park found that plaintiff's corrected vision with glasses was 20/60 in the right eye, which was

1  fairly good, and 20/20 in the left eye.  Dr. Park diagnosed a retinal detachment in the right eye

2  with multiple retinal holes in the left eye.  Plaintiff had lattice retinal degeneration which means

3  he had thin patches, which predisposed him to retinal detachment.  Dr. Park concluded that

4  plaintiff should have surgery to repair the retinal detachment in the right eye, and laser treatment

5  of the left eye to minimize the risk of a retinal detachment in that eye.  Emergency surgery was

6  scheduled for the following day.

7         11.  On October 27, 2005, Dr. Park performed (1) pars plana virectomy, sclera

8  buckle, air-fluid exchange, endolaser photocoagulation, and eighteen-percent SFG gas injection

9  on the right eye, and (2) indirect retinal photocoagulation on the left eye.  In laymen's terms, Dr.

10  Park removed the jelly that fills the back of the eye because the vitreous jelly tugs on the retina

11  and can cause future detachments, and because plaintiff had some bleeding into the vitreous jelly,

12  which prevented Dr. Park from identifying all the pathology in the eye.  (Dkt. No. 54-5 at 24.)

13  Once the jelly was removed, Dr. Park identified the retinal tears and holes that had resulted in the

14  detached retina, flattened the retina by injecting a gas bubble in the eye, and sealed the retinal

15  holes with laser treatment.  (Id.)  Dr. Park then wrapped the right eye with a plastic band, called a

16  sclera buckle, to give the eye some protection from future detachment, and then performed laser

17  treatment on the thin areas and retinal holes of the left eye.  (Id.)

18         12.  About 70 to 90 percent of surgeries for retinal detachment of the kind

19  performed on plaintiff's right eye are successful, depending on whether the surgery is for initial

20  detachment, and whether the patient has other complicating factors.  (Dkt. No. 54-5 at 25.)  The

21  success rate for retinal laser prophylactics of the kind performed on plaintiff's left eye is about 95

22  percent.

23         13.  Plaintiff's prospect for successful surgery was good because plaintiff's "initial

24  presenting vision was quite good," it was an initial detachment, and Dr. Park didn't see any scar

25  tissue.  (Dkt. No. 54-5 at 27.)  But plaintiff's pre-existing conditions put him "at increased risk

26  for another [retinal] detachment" . . . [due to] "the fact [plaintiff] had a lot of thin areas with

1   multiple retinal holes and tears in both eyes." (Dkt. No. 54-5 at 27.)

2            14.  The success of surgery in which a gas bubble is placed in the eye also

3   depends on how well the patient follows post-surgery care instructions, which include lying face-

4   down and not on one's back; not traveling to high attitude locations which can expand the gas

5   bubble; and avoiding bending and straining, which can cause bleeding to the eye.  (Dkt. No. 54-5

6   at 26.)

7            15.  Before plaintiff was discharged from the hospital on October 27, 2005, Dr.

8   Park provided post-surgery instructions, including lying face down or on the right side as much

9   as possible so that the gas bubble would maintain pressure and keep the retina attached, and

10  ordered Tylenol #3, one tablet every four to six hours, as needed, for pain, with a follow-up the

11  next morning.  Dr. Park told plaintiff that as long as the retina stayed attached, there was a good

12  chance he would keep his vision, and that he might actually have some vision improvement.

13  (Id.)  Dr. Park informed plaintiff "he may need down the line to get a new pair of glasses because

14  the surgery does change the prescription in the eye before we know what his final vision is going

15  to be." (Id.)  Dr. Park explained she "usually tell[s] [her] patients that . . . we may not know what

16  the final vision in that eye is going to be for at least three months." (Id.)  Dr. Park did not tell

17  plaintiff that eyeglasses would eliminate his double vision.  (Dkt. No. 59-1 at 3.)

18           16.  Upon return to the prison, plaintiff saw Dr. Duc who told him there were no

19  available beds in the infirmary, so plaintiff was returned to his cell.  Dr. Sihota ordered Tylenol

20  No. 3 (acetaminophen/codeine), two tablets, three times a day, for 24 hours, and Phenergan, 50

21  mg. IM for nausea and vomiting, and an appointment for a follow-up the next morning with Dr.

22  Park.

23           17.  Dr. Park saw plaintiff the day after surgery, October 28, 2005, for follow-up

24  and noted that the right eye retina was attached, that plaintiff had a slight elevation of intraocular

25  pressure that was not a concern, and that plaintiff was doing well.  At this appointment, Dr. Park

26  was looking to see if there was an infection, whether the retina was still attached, whether

1   intraocular pressure from the gas bubble was too high, and to go over pain management and

2   prescribe medications.  Plaintiff did not have an infection, the retina was still attached, and the

3   intraocular pressure was slightly high, but not of concern.  Dr. Park prescribed:  Darvocet-N, 100

4   mg., one tablet every six hours, as needed, for pain for two weeks; Maxitrol (neomycin/

5   polymyxin/dexamethasone), an eye ointment containing cortisone to make the eye more

6   comfortable; antibiotics to prevent infection, to be applied three times a day for two weeks; and

7   Atropine ointment to dilate the eye and make it more comfortable, to be applied to the right eye

8   three times a day.  Dr. Park told plaintiff he might have double vision after his eye healed.  (Dkt.

9   No. 54-5 at 38; Dkt. No. 54-4 at 33.)

10          18.  Plaintiff returned to prison on October 28, 2005.

11          19.  Medical records indicate that a copy of Dr. Park's post-surgery management

12   plan, with prescribed medications, was received at the prison on October 31, 2005.  (Dkt. No. 54-

13   3 at 16.)  Dr. Duc saw plaintiff the next day on November 1, 2005.  (Id. at 19.)  Dr. Duc changed

14   the initial medications he ordered to the ones recommended by Dr. Park (Atropine, Maxitrol, and

15   Darvocet) for 14 days, except that Dr. Duc ordered Tylenol #3 with codeine for pain.  (Id. at 19,

16   35-37.)

17          20.  On November 4, 2005, Dr. Park saw plaintiff for a routine one-week follow-

18   up.  At that time, Dr. Park was checking to see if the retina was still attached; whether there was

19   infection, bleeding, or loss of vision; and whether intraocular pressure had become normal.

20   Plaintiff's retina was attached; there was no infection or bleeding; plaintiff's vision was slightly

21   better than the previous week; and plaintiff's intraocular pressure was normal after half the gas

22   bubble was gone.  Dr. Park stopped the Atropine; continued the Maxitrol twice a day until it ran

23   out, which would have been in about two weeks; and scheduled plaintiff for a follow-up

24   appointment in three or four weeks.  The Maxitrol was most important the first week after

25   surgery, when the risk of infection was greatest.  Dr. Park usually ordered that medication for

26   three to four weeks because infection can occur within two weeks of surgery, although that is less

common after the first week.  Maxitrol also provides some comfort to help the eye heal.

21.  When plaintiff returned from the November 4, 2005 appointment, plaintiff told Dr. Duc that he was supposed to see Dr. Park again, but that a classification committee had recommended his transfer to another prison.  Plaintiff asked that Dr. Duc place a medical hold on his transfer to another prison because he thought Dr. Park was going to perform further surgery on his right eye.  No medical hold was placed in plaintiff's records.

22.  On November 9, 2005, plaintiff saw Dr. Duc for follow-up and told him he was doing fine, but had pain, and that the medication he was taking for pain made him nauseous.  Dr. Duc discontinued the Tylenol #3 with codeine and instead prescribed Darvocet-N (propoxyphene/ APAP), 100 mg., one tablet, four times a day, as needed for pain for 30 days.  Plaintiff again told Dr. Duc that he was going to be transferred to another prison and needed a medical hold.  No medical hold was placed in plaintiff's records.

23.  On November 21, 2005, defendant Lampkin, one of the floor correctional officers in plaintiff's housing unit, told plaintiff and his cellmate to pack their property because they were going to be transported to Calipatria State Prison.  Plaintiff said he could not go anywhere in his condition, and asked defendant Lampkin to call Dr. Duc to find out if there was a medical hold.  Defendant Lampkin said he could not do anything, refused to call Dr. Duc, and gave plaintiff and his cellmate bags to put their things in.  Plaintiff then took the bags containing his property to the floor where defendant Lampkin put plaintiff's medications in a box with plaintiff's other property.  Plaintiff again said he should have a medical hold, and asked defendant Lampkin to call Dr. Duc, but defendant Lampkin refused, and told plaintiff that the only way plaintiff would stay was if he "boarded up," that is, if plaintiff went into his cell and refused to come out.  Plaintiff said he could not do that in his medical condition.

24.  Defendant Lampkin then took plaintiff's boxes to Receiving and Release ("R&R").  Plaintiff asked defendant Lampkin to check with Dr. Duc about a medical hold as they were going through the sallyport to R&R, where the clinic was, but defendant Lampkin refused.

1  When they arrived at R&R, the sergeant there was responsible for giving the boxes to the

2  transport officers on the bus.  R&R staff and the transportation officers were supposed to give

3  plaintiff his medications to take with him on the bus.  Plaintiff had no further contact with

4  defendant Lampkin after plaintiff was escorted to R&R.  Plaintiff's medications remained packed

5  in his property, which was not put on the bus with plaintiff when he left the prison.

6          25.  Plaintiff left the California State Prison – Sacramento on November 21, 2005,

7  25 days after surgery, and arrived at Calipatria State Prison the next day, after an overnight stay

8  at Delano State Prison.  Plaintiff did not have his medications during the day and a half it took to

9  travel to Calipatria State Prison.

10          26.  Dr. Duc ordered the antibiotic/anti-inflammatory eye ointments on November

11  1, 2005, and the prescriptions would have expired two weeks from November 1, 2005.  On

12  November 4, 2005, Dr. Park ordered plaintiff to use the antibiotic/anti-inflammatory eye

13  ointments until they ran out.

14          27.  Plaintiff arrived at Calipatria State Prison on November 22, 2005.  When

15  plaintiff arrived at Calipatria State Prison, his medical records with his most recent eye treatment

16  were not with his property.  Plaintiff's medications also did not arrive with the transportation

17  officer.  Plaintiff was seen by Medical Technical Assistant ("MTA") L. Carabello who

18  documented plaintiff's statements that he had eye surgery three weeks before, and had "lots of

19  pain" in his right eye.  (Dkt. No. 54-3 at 22.)  At 4:55 p.m., RN/MTA/MD[2] G. Ramirez evaluated

20  plaintiff, took plaintiff's vitals, noted plaintiff's current medication as Darvocet 100 mg, and

21  referred plaintiff to Dr. Levin.  (Dkt. No. 54-3 at 23.)  At 6:00 p.m., Dr. Levin noted there were

22  "no records of [plaintiff's] last eye app[ointment]."  (Dkt. No. 54-3 at 38; see also Dkt. No. 59 at

23  ////

24  ////

25

26          [2]  The record does not reflect G. Ramirez' title.  (Id.)

19.)  Dr. Levin tried to contact FSP[3] and UCDMC to determine what medications plaintiff

required.  (Dkt. No. 59 at 19.)  "Since these efforts failed to produce any additional information

and [plaintiff] did not know what medication he was on, Dr. Levin provided [plaintiff] with

antibiotic Opthalmic drops and oral analgesics until the Opthalmologist could see [plaintiff]."

(Dkt. No. 59 at 19.)  Specifically, Dr. Levin ordered an antibiotic, sufacetamide opthalmic 10%

ointment, four times a day (q.i.d.) to the right eye, and Motrin, 600 m.g. every six hours as

needed for pain for five days.  (Id.)  Dr. Levin re-patched plaintiff's right eye, instructed plaintiff

to avoid trauma to the right eye, and ordered a follow-up with opthalmology the following week.

(Id.)  Dr. Levin directed nursing staff to call Utilization Management at CSP-Sacramento to

determine whether plaintiff had been approved for further treatment.  (Id.)  At 7:32 p.m.,

someone at UCDMC faxed to Calipatria State Prison a copy of Dr. Park's surgical report.  (Dkt.

No. 54-3 at 25-27.)  The surgical report did not contain any information concerning post-surgical

follow-up or medications to be prescribed after surgery, and neither the report nor the fax cover

sheet contained plaintiff's CDC inmate identification number.  (Id.)

28.  Plaintiff was scheduled to see Dr. Park on December 2, 2005.  (Dkt. No. 54-5

at 21.)  Dr. Park explained that the purpose of this follow-up appointment was

> to make sure that the retina is still healing properly, to make sure
> [plaintiff] doesn't still have a retinal detachment.  The risk of
> infection is still there, so we still look for infection, although the
> risk is very much lower at this point.  Also after retinal detachment
> surgery other things can occur.  The patient can end up with a
> droopy eyelid or double vision, and so we just want to make sure
> that the patient is healing properly and regaining their vision.

(Dkt. No. 54-5 at 39.)  Dr. Park would ordinarily see the patient again in two or three months to

make sure the retina is healing well, that the patient is not having any side effects from the

---

[3]  The record does not identify "FSP."  In California's prison vernacular, "FSP" stands for Folsom State Prison.  (Dkt. No. 59 at 19.)  It is unclear whether RN Gray referred to "FSP" as Folsom State Prison, which can be Old Folsom State Prison or CSP-Sacramento, both of which are physically located in Folsom, California.  The record is clear, however, that Dr. Levin was aware plaintiff was previously housed at CSP-Sacramento.  (Dkt. No. 54-3 at 38.)

1    surgery, and then in another three months the patient would be evaluated for new eyeglasses.  (Id.

2    at 39-40.)

3                29.  Dr. Park opined that if plaintiff was still having eye problems, plaintiff was

4    not required to be seen by Dr. Park, so long as plaintiff was seen by "a retina specialist around

5    [plaintiff's] new facility around the time that [plaintiff and Dr. Park] had the appointment."  (Dkt.

6    No. 54-5 at 42.)

7                30.  Plaintiff was seen by Dr. Majid Mani, a Board-certified opthalmologist, on

8    November 30, 2005, for follow-up care.  (Dkt. No. 54-7 at 25.)  This appointment was two days

9    before plaintiff would have seen Dr. Park, and 34 days after plaintiff's surgery on his right eye.

10   In a letter dated November 30, 2005, Dr. M. Mani stated:

11                    Retinal detachment repair was done a few weeks ago in northern
                     California.  The retina is flat at this time.  The left eye has had laser
12                   for retinal tear and it looks good at this time.

13                   [Plaintiff] has significant cystoid macular edema in the right eye.
                     Foveal thickness of right eye is 453 micron with left eye at 174
14                   microns.  I am going to start [plaintiff] on Pred Forte 1 drop in
                     right eye four times daily as well as Atropine.  I will follow him
15                   back in six weeks and if there is no improvement, I will give an
                     intravitreal injection of Triamcinolone to bring the inflammation
16                   down.

17   (Dkt. No. 54-8 at 35.)  At his deposition, Dr. M. Mani clarified that a "flat" retina means the

18   retina is normal or okay.  (Dkt. No. 54-7 at 26.)  In other words, the retina was still attached.  Dr.

19   M. Mani further clarified that "significant cystoid macular edema" means

20                   this is a normal thing that can happen with retinal detachment.
                     Basically the patient has -- the retina has a little bit of edema,
21                   inflammation.  Means the retina is thicker than normal.

22   (Dkt. No. 54-7 at 26.)  Finally, Dr. M. Mani clarified that the foveal thickness comment means

23   that because the right eye [had] retinal detachment repair, the right eye, the edema, the swelling

24   of the retina was twice as much as the left eye because the eye was sick, went through surgery."

25   (Id. at 27.)  Dr. M. Mani ordered: Atropine Sulfate 1%, 15 ml., one drop, q.i.d. in the right eye

26   every four hours for comfort; Pred Forte 1%, 15 ml., one drop, q.i.d. in the right eye every four

1  hours; an injection of Triamcinolone for inflammation, if the drops did not work; and a follow-up

2  appointment ordered for January 11, 2006.  (Dkt. No. 54-3 at 39.)

3         On November 30, 2005, plaintiff's vision in his right eye was 20/200.  (Dkt. No.

4  54-8 at 8.)

5         31.  Plaintiff's January 11, 2006 follow-up appointment was rescheduled to

6  January 25, 2006.  (Dkt. No. 59-1 at 7.)

7         32.  On January 25, 2006,[4] Dr. M. Mani saw plaintiff for follow-up and diagnosed

8  plaintiff as having a recurrent retinal detachment with proliferative vitreoretinopathy ("PVR")

9  and subretinal fibrosis.  (Dkt. No. 54-8 at 78.)  The detached retina was confirmed by ultrasound.

10 (Dkt. No. 54-8 at 77.)  Plaintiff's vision in his right eye was recorded as 20/400.  (Dkt. No. 54-8

11 at 34.)

12        At his deposition, Dr. M. Mani clarified that "subretinal fibrosis" means extensive

13 scarring in the retina."  (Dkt. No. 54-7 at 37.)  PVR is a scarring formation, contraction of the

14 retina, and detachment of the eye.  (Dkt. No. 54-7 at 85.)  Dr. M. Mani explained that PVR is a

15 "process" that happens slowly; that is, it "doesn't happen five days after the surgery . . . [or] one

16 month after the surgery," . . . [it] "usually takes a few months."  (Id.)

17        Dr. M. Mani described the possible causes of retinal detachment:

18               a.  PVR.  (Dkt. No. 54-7 at 85.)

19               b.  Lattice degeneration:  where the retinal periphery is thin, and the retina

20 contracts over time, the vitreous gel contracts and pulls the thinning retina with it and tears it, or

21 makes a hole in it.  Then the fluid will go underneath the retina and the retina detaches.  (Dkt.

22

23        [4] Plaintiff argues, for the first time, that had Dr. M. Mani kept the January 11, 2006
   appointment with plaintiff, Dr. M. Mani could have prevented plaintiff's second retinal
24 detachment or, at least, lessened the odds of permanent vision loss in the right eye.  (Dkt. No. 59-
   1 at 6.)  Plaintiff also claims that the delay from January 11, 2006 to the February 22, 2006
25 surgery to repair the detached retina, gave plaintiff's retina further time to shrink which also
   lessened the chance of plaintiff recovering vision in his right eye.  (Dkt. No. 59-1 at 7.)
26 However, these claims are not at issue in this action, and Dr. Mani is not a named defendant.

No. 54-7 at 86.)  "Basically contraction of the vitreous gel is putting a mechanical traction on the anterior surface of the retina, pull[s] the retina forward, makes a tear or hole, and then fluid will go underneath, retina detaches.  That's the most common [cause]."  (Id. at 87.)

c.  Trauma:  all boxers develop retinal detachment because the "movement back and forth will cause the retina to detach."  (Dkt. No. 54-7 at 87.)  Football players can also develop detached retinas.  (Id. at 89.)

d.  Diabetes will cause retinal detachment.  (Id. at 87)

e.  Cataract repair surgery at a young age can place patients at more risk for retinal break, retinal tear, or retinal detachment because there is more tension on the retina. (Dkt. No. 54-7 at 88.)

f.  Dr. M. Mani concluded that some genetic and some mechanical causes can factor into a retinal detachment.  (Dkt. No. 54-7 at 88.)

However, Dr. M. Mani opined that plaintiff's retinal detachment was caused by PVR, scar tissue forming, "[b]ecause [plaintiff's] eye was very sick to start with."  (Dkt. No. 54-7 at 96.)

Dr. Park opined that she was not surprised by the second detachment because first, plaintiff had multiple tears and holes in his retina.  (Dkt. No. 54-5 at 49.)  Second, plaintiff developed PVR.  (Id.)  In other words, plaintiff "had an abnormal healing response to the first surgery and he developed scar tissue on top of the retina that pulled the retina off, and that can happen in some patients."  (Dkt. No. 54-5 at 50-51.)  Dr. Park explained no one knows the cause of PVR—it is an area of research, and there is no good treatment to prevent PVR.  (Id. at 51; 74.) Dr. Park stated her "personal feeling" is that she sees PVR "more in younger people just because younger people have stronger healing response[s]."  (Id. at 74.)  "It's more of a healing response that's inherent to the patient."  (Id.)  Dr. Park defined a "young" person, in this context, as "anyone below 60 years of age."  (Id.)

To treat PVR, Dr. Park would inject a steroid of much higher concentration than

Maxitrol to minimize the risk of another detachment.  (Id. at 51.)  Dr. Park opined that ointments or drops are not highly-concentrated enough.  (Id.)  Dr. Park added that not everyone uses this steroid routinely because it can cause glaucoma.  (Id. at 52.)  Most significantly, Dr. Park confirmed that there was nothing that could be done to prevent the second detachment.  (Id. at 52-53)

Dr. Mr. Mani saw plaintiff for follow-up on January 31, 2006.  (Dkt. No. 54-8 at 76.)  Plaintiff's vision was recorded as 20/400.  (Id.)

33.  On February 6, 2006, Dr. Nasrin Mani saw plaintiff, found plaintiff had retinal detachment with PVR in the right eye, and recommended further surgery to reattach the right retina.  (Dkt. No. 54-9 at 20.)

34.  On February 22, 2006, Dr. Nasrin Mani performed pars plana vitrectomy, epiretinal membrane peeling, and retinotomy, air-fluid exchange, endolaser, and silicone oil injection of the right eye.  (Dkt. No. 54-9 at 45-46.)  At her deposition, Dr. N. Mani explained that she removed the vitreous or residual gel from the eye, peeled the membrane from the surface of the eye, made a hole (retinotomy), replaced the fluid with air, lasered, then injected silicone oil.  (Dkt. No. 54-9 at 22.)

35.  On May 31, 2006, Dr. Nasrin Mani performed a procedure to remove silicone oil from the right eye thereby forcing the retina against the eye in order to keep it attached following the surgery, pars plana vitrectomy, epiretinal membrane peeling, endolaser, air-fluid exchange, SF6 20 percent gas-air exchange in the right eye.  Plaintiff had further surgery to remove scar tissue and oil from the right eye.

36.  By July 10, 2006, plaintiff's vision had improved from seeing hand movement to 20/300.

37.  On August 4, 2006, plaintiff's vision was 20/400 which was about the same as the previous visit and what would be expected for his condition.

38.  On October 11, 2006, plaintiff had a third surgery for a recurrent retinal

15

detachment with proliferative vitreoretinopathy and epiretinal membrane of the right eye.  Dr.
Nasrin Mani performed a pars plana vitrectomy, membrane peeling, retinotomy, air-fluid
exchange, endolaser, and silicone oil injection of the right eye.

39.  By November 1, 2006, plaintiff's vision had decreased to hand motions,
which was significantly worse than in July and August of 2006.

40.  On February 14, 2007, Dr. Nasrin Mani performed a procedure to remove the
silicone oil from plaintiff's right eye.  Plaintiff's retina was still attached at that time.

41.  In September of 2007, plaintiff could see hand motion with his right eye,
which was worse than before his first surgery because, even though the retina was attached,
plaintiff had a macular hole in his right retina that was likely idiopathic, i.e. it happens in ninety
percent of patients who have it, or it was due to PVR that could have caused the hole in the
macula by pulling the retina.  Plaintiff was also developing a mild cataract in his left eye, but
vision in his left eye was 20/20.

42.  By December 17, 2007, plaintiff's right retina was still attached, but vision in
the right eye had decreased to light perception only, which was significantly worse than before
the first surgery.  It is not uncommon with multiple retinal reattachment surgeries to end up with
final vision that is not very good, even if doctors are successful in fixing the detachment.

43.  By May 3, 2008, Dr. Mani noted that the optic nerve in plaintiff's right eye
looked pale because of the repeated surgeries for retinal detachments in that eye which can
damage the nerve.  (Dkt. No. 54-5 at 57-59.)  When addressing plaintiff's loss of vision in his
right eye, Dr. Park opined that

> [i]t could be from the trauma of the . . . multiple surgeries.  There
> is some theory that silicone oil could have some toxic effects
> because we do have once in a while patients where we use silicone
> oil to fix the retinal detachment and the retina looks beautiful but
> they can't see.  And so one of the theories is that . . . maybe the oil
> may be toxic to the retina in some patients.  That hasn't been
> proven because I have patients who have oil in the eye for years
> and still see fine.

1
2
3
4

> So it's possible just the trauma of multiple surgeries could cause damage to the retina and to the nerve and cause pallor.  The nerve pallor can occur if enough of the retina is damaged because the nerve cells that make the retina make the optic nerve, and so if there's too much damage to the . . . retina, the nerve will be damaged also because it's basically part of the retina in a sense.

5   (Dkt. No. 59-4 at 58-59.)  Dr. Park stated that surgery can only fix the retinal detachment.  (Dkt.

6   No. 54-5 at 59.)  In other words, the damage to the retina caused by the retinal detachment cannot

7   be repaired by surgery.  (Id.)  "[S]ome of the damage can reverse [on its own] and some of the

8   damage will not reverse."  (Id.)  "And we still don't understand why [in] some people it reverses

9   quickly and other people it doesn't reverse."  (Id.)

10   V.   Eighth Amendment Claim

11          Legal Standard

12          In order to state a § 1983 claim for violation of the Eighth Amendment based on

13   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

14   deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

15   To prevail, plaintiff must show both that his medical needs were objectively serious, and that

16   defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299

17   (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of

18   mind for a medical claim is "deliberate indifference."  Hudson v. McMillian, 503 U.S. 1, 6

19   (1992).

20          A serious medical need exists if the failure to treat a prisoner's condition could

21   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

22   that a prisoner has a serious need for medical treatment are the following:  the existence of an

23   injury that a reasonable doctor or patient would find important and worthy of comment or

24   treatment; the presence of a medical condition that significantly affects an individual's daily

25   activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright,

26   900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-

01 (9th Cir. 1989); McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Negligence is insufficient. Farmer, 511 U.S. at 835. Moreover, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37. Nor is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842.

"Deliberate indifference" is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 837-42. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). However, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state

18

a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs,
766 F.2d 404, 407 (9th Cir. 1985).  Although the delay in medical treatment must be harmful,
there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060,
citing Wood, 900 F.2d at 1339-40.  A finding that an inmate was seriously harmed by the
defendant's action or inaction tends to provide additional support for a claim of deliberate
indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d at 1060.  In summary,
"the more serious the medical needs of the prisoner, and the more unwarranted the defendant's
actions in light of those needs, the more likely it is that a plaintiff has established deliberate
indifference on the part of the defendant."  Id. at 1061.

Analysis

1.  Defendant Lampkin

Plaintiff contends defendant Lampkin was deliberately indifferent because he
failed to stop plaintiff's transfer to a different prison by calling Dr. Duc or asking the MTA to
check and see if there was a medical hold on plaintiff.  However, defendant Lampkin was not
authorized to diagnose or treat plaintiff's medical condition.  Cal. Code Regs. tit. 15, § 3354(a)
(2010).  Defendant Lampkin was also not authorized to issue a medical hold.  (Dkt. No. 23-5
"The HCM/CMO or the PCP[5] shall generate a CDC 128-C, Chrono – Medical, Dental,
Psychiatric, to initiate a Medical Hold.")  It is undisputed that Dr. Duc did not place a medical
hold in plaintiff's records.

Plaintiff argues that defendant Lampkin could have prevented plaintiff's transfer
"by a simple phone call."  (Dkt. No. 59 at 10.)  However, it is undisputed that plaintiff previously
asked Dr. Duc for a medical hold on November 4 and November 9, 2005, and Dr. Duc did not
issue a medical hold.  So even if defendant Lampkin had taken the steps requested by plaintiff,
plaintiff has failed to demonstrate Dr. Duc would have issued a medical hold at that time.

_____

[5]  The "HCM" is health care manager; the "CMO" is Chief Medical Officer; and the
"PCP" is primary care physician.  (Dkt. No. 23.)

1   Moreover, plaintiff has not shown that the medical condition of his eye had changed from

2   November 9, 2005, to November 21, 2005, the date of his transfer, so that it would warrant the

3   issuance of a medical hold.  Indeed, once plaintiff arrived at Calipatria, it is undisputed his retina

4   was still attached.  Although plaintiff states defendant Lampkin refused to ask the MTA to check

5   to see if there was a medical hold, the transfer policy states that the R&R registered nurse ("RN")

6   shall notify the pharmacy and the Specialty Clinic RN, and "[i]f the R&R RN identifies an

7   inmate/patient who requires a Medical Hold, the HCM shall be notified."  (Dkt. No. 23-3 at 3.)

8   Plaintiff has provided no evidence to support his theory that defendant Lampkin was responsible

9   to stop plaintiff's transfer based on a medical condition.  The record reflects no medical hold was

10  placed in plaintiff's records to bar his transfer, so defendant Lampkin cannot be held liable for

11  his alleged failure to check on the status of a medical hold or to stop the transfer.

12          Plaintiff also alleges that defendant Lampkin was deliberately indifferent because

13  he failed to ensure plaintiff's medications and eye patches were on the bus for transport with

14  plaintiff to the new facility.  (Dkt. No. 23 at 8.)  However, it is undisputed that plaintiff's

15  medications and eye patches were packed in a box, placed with plaintiff's property, and delivered

16  to R&R.  It is also undisputed that the R&R sergeant was responsible for giving the boxes to the

17  transport officers on the bus, and that the R&R staff and the transportation officers were

18  supposed to give plaintiff his medications to take with him on the bus.  Because defendant

19  Lampkin was not responsible for placing plaintiff's medications on the bus,[6] defendant Lampkin

20  did not fail to follow protocol, and this claim should also be denied.[7]

21

22          [6]  Similarly, because defendant Lampkin was not responsible for placing plaintiff's
    medications, which included plaintiff's Maxitrol eye ointment, on the transport bus, the court
23  need not address the issue of whether an unidentified prison employee's failure to place
    plaintiff's medications on the transport bus caused or contributed to plaintiff's subsequent retinal
24  detachment.

25          [7]  In plaintiff's Statement of Disputed Facts, plaintiff states defendant Lampkin ignored
    Dr. Park's post-surgery care instructions and had plaintiff pack and carry his heavy property
26  down stairs to be inventoried.  (Dkt. No. 59 at 3.)  However, plaintiff cites to his original

1    For all of the above reasons, defendant Lampkin is entitled to summary judgment.

2        2.  Defendant Dr. Duc

3    Defendants have borne their initial responsibility of establishing an entitlement to

4    summary judgment by presenting the expert opinions of Dr. Park and Dr. M. Mani summarized

5    above.  Therefore, the burden shifts to plaintiff to establish the existence of genuine issues of

6    material fact requiring a trial.  As the party who will bear the burden of proof at trial, plaintiff

7    may not rely on the allegations of his complaint or on mere argument, but must provide evidence

8    that demonstrates the existence of genuine issues as to material facts.

9        Plaintiff claims he was transferred in violation of CDCR policy and procedures on

10   Health Care Transfer Process, and provides a copy of the process.  (Dkt. No. 23-3.)  Plaintiff

11   cites to the section on Medical Hold, which states the following, in pertinent part:

12           The Medical Hold Process shall be utilized when an inmate/patient
             requires medically necessary health care services which would be
13           medically prudent to occur at the CDC institution where the
             inmate/patient is housed.
14           . . .

15           2.  The PCP and/or HCM/CMO shall review the UHR and verify
             that the inmate/patient's condition warrants a Medical Hold.  The
16           following conditions may require a Medication Hold for an
             inmate/patient:

17
             2.c.  A transfer is scheduled and the inmate/patient has had a
18           relapse or is otherwise temporarily medically unable to transfer to
             the endorsed location (i.e. recuperating from surgery or serious
19           illness).

20   (Dkt. No. 23-5.)

21       Here, as noted above, Dr. Duc declined to issue a medical hold on November 4

22   and November 9, 2005.  The policy on which plaintiff relies did not require Dr. Duc to issue a

23   medical hold.  First, the policy states the process "shall" be used "when an inmate/patient

24   ────────────────

25   complaint, which is no longer operative in light of the filing of plaintiff's amended complaint.
     (Dkt. No. 19 at 9, citing Local Rule 15-220.)  In any event, plaintiff has failed to demonstrate
26   defendant Lampkin was aware of Dr. Park's post-surgery instructions.

1   'requires' medically necessary health care services."  This language means the doctor must

2   determine if the patient requires medically necessary services.  If the doctor determines the

3   patient requires the services, then the doctor shall issue a medical hold.  But the doctor must first

4   make that determination.  Second, the policy states that certain conditions "may" require a

5   medical hold.  Use of the word "may" is conditional, not mandatory.  This language requires

6   another determination by the doctor.  Third, the "condition" on which plaintiff seeks to rely does

7   not include plaintiff.  The evidence does not reflect that plaintiff suffered a relapse on November

8   21, 2005, the date he transferred.  The evidence does not suggest plaintiff was "temporarily

9   unable to transfer" even though plaintiff had eye surgery on October 27, 2005.

10            Indeed, defendants have provided Dr. Park's expert opinion that it was not

11   important for plaintiff to remain at his present prison so plaintiff could continue treatment with

12   her, but that

13            it was more important that [plaintiff] be seen by an eye specialist if
         his vision is not good.  [Plaintiff] doesn't necessarily have to see
14            me.  But if he's still having eye problems, it's important to keep
         the follow-up appointment. . . . [I]f I knew he was being
15            transferred, . . . he probably should have been seen by a retina
         specialist around his new facility around the time that we had the
16            appointment.  That would be ideal.  It doesn't necessarily have to
         be me but somebody with similar training.

17

18   (Dkt. No. 54-5 at 42-43.)  Dr. Park's opinion validates defendant Dr. Duc's decision not to place

19   a medical hold on plaintiff's records.  Plaintiff has provided no expert opinion or other probative

20   evidence to rebut Dr. Park's opinion.  Indeed, plaintiff has provided no expert declarations from

21   any doctor supporting plaintiff's position.  See Hutchinson v. United States, 838 F.2d 390 (9th

22   Cir. 1988) (in medical malpractice action, when defendant supports motion for summary

23   judgment with declarations of expert, and conduct under the circumstances is not within the

24   common knowledge of laymen, plaintiff who has presented no expert evidence concerning

25   required standard of care has failed to make sufficient showing that there are genuine issues for

26   trial) .

1   The undisputed evidence also reflects that plaintiff was seen shortly after arrival at

2   Calipatria by Dr. Levin who treated plaintiff appropriately (dkt. no. 54-5 at 80-81), and he

3   ordered a follow-up appointment for plaintiff with opthalmology the following week.  Plaintiff

4   was seen by a board-certified retina specialist, Dr. M. Mani, on November 30, 2005, which was

5   two days before plaintiff would have seen Dr. Park.  This appointment was well within the time

6   frame plaintiff would have been seen by Dr. Park.  It is also undisputed that plaintiff's retina was

7   attached when he arrived at Calipatria State Prison, and on November 30, 2005.  In addition, Dr.

8   Park opined that the fact that on November 30, 2005, plaintiff's vision was 20/200 and his retina

9   was not detached "indicates the surgery was successful, at least until the end of November."

10  (Dkt. No. 54-5 at 47-48.)

11  Based on this undisputed evidence, plaintiff has failed to demonstrate Dr. Duc

12  was deliberately indifferent to plaintiff's serious medical needs by allegedly failing to place a

13  medical hold on plaintiff's records or to stop plaintiff's transfer.

14  Plaintiff argues that he was to return to Dr. Park to have "plates" put in his eyes to

15  correct his double vision.  Plaintiff insists he did not misunderstand Dr. Park's advice that

16  plaintiff may need to have new eyeglasses to correct his vision.  Plaintiff states that Dr. Park

17  "never mentioned to [plaintiff] that eye glasses would eliminate the double vision he would have

18  from the surgery."  (Dkt. No. 59-1 at 3.)

19  Dr. Park testified at her deposition that she read plaintiff's letter referring to an

20  alleged procedure to install plates in plaintiff's right eye after his eye healed from the surgery.

21  (Dkt. No. 54-5 at 39.)  Dr. Park stated she was not sure what plaintiff was referring to in terms of

22  "plates."  (Id.)  Dr. Park continued:

23   He may have misunderstood me.  Usually when they're healed, we
     send them for new glasses and maybe that's what he meant.  But . .
24   . the surgery was complete and so there was no need for additional
     surgery unless [plaintiff] developed another detachment or some
25   complication from the surgery.

26  (Dkt. No. 54-5 at 40.)

23

1    Plaintiff has provided no evidence to support his view that Dr. Park was going to

2    perform another surgery.  The medical records provided belie plaintiff's belief.  The October 28,

3    2005 medical record reflects plaintiff was to return in one week for "follow-up."  (Dkt. No. 23 at

4    13.)  There is no mention of further surgery.  Dr. Park intended to make sure the retina was still

5    attached, and that there were no other complications.

6    Plaintiff has provided no evidence to demonstrate he was to be scheduled for

7    further surgery to put "plates" in his eyes to correct his double vision.  Nor has plaintiff provided

8    any evidence to support his theory that "plates" should be placed in a patient's eyes to correct

9    double vision.  See Hutchinson, supra.  Moreover, Dr. Park stated "the surgery was complete and

10   so there was no need for additional surgery unless [plaintiff] developed another detachment or

11   some complication from the surgery."  (Dkt. No. 54-5 at 41.)  Plaintiff's retina was not detached

12   when he arrived at Calipatria, or on November 30, 2005, when he saw Dr. M. Mani.  The

13   evidence demonstrates plaintiff did not require further surgery at any time between October 28,

14   2005, and November 30, 2005.

15   In his opposition, plaintiff argues that Senior U.S. District Judge Thelton E.

16   Henderson was concerned by prisoner complaints of "transfer in lieu of treatment."  (Dkt. No. 59

17   at 5.)  However, the evidence here reflects plaintiff was not transferred in lieu of treatment.  The

18   evidence demonstrates plaintiff was seen by a doctor shortly after arrival at Calipatria, and by an

19   eye specialist the following week.  In fact, plaintiff was seen by two different specialists after

20   plaintiff was transferred to Calipatria State Prison.  Dr. Park confirmed that plaintiff's follow-up

21   treatment at Calipatria was appropriate.  (Dkt. No. 54-5 at 80-81.)   Plaintiff admits he has

22   received at least four surgeries on his right eye.  In light of this evidence, as well as all the

23   medical records documenting plaintiff's various treatments, plaintiff's suggestion that he was

24   transferred in lieu of treatment is specious.

25   ////

26   ////

1    In the second amended complaint, plaintiff alleges that:

2    Even the Chief Medical Officer at Calipatria State Prison, Dr.
     Levin, stated that:  Folsom should have put a medical hold on
3    plaintiff Lara, that [plaintiff] shouldn't have been transferred in
     [his] condition, with no medical chart or the identity of medication
4    [he] was taking.

5    (Dkt. No. 23 at 6.)  Plaintiff appended a copy of a first level medical appeal response authored by

6    RN C. Gray, Supervising RN II, at Calipatria State Prison, who stated "FSP failed to do a

7    Medical Hold prior to transfer."  (Dkt. No. 59 at 19.)

8           There is no indication in the first level appeal response that Dr. Levin informed

9    RN Gray that a medical hold should have been issued to retain plaintiff at CSP-Sacramento.

10   (Dkt. No. 59 at 19-20.)  Moreover, plaintiff did not provide a declaration by Dr. Levin

11   confirming this alleged statement, or a declaration by RN Gray stating she thought a medical

12   hold should have been issued.  Indeed, plaintiff provided no expert opinion supporting plaintiff's

13   view that Dr. Duc should have placed a medical hold retaining plaintiff at CSP-Sacramento

14   based on plaintiff's medical condition.  As noted above, plaintiff has failed to rebut Dr. Park's

15   expert opinion to the contrary.  A difference of opinion between a prisoner and prison medical

16   staff as to appropriate medical care does not give rise to a § 1983 claim.  Franklin v. Oregon, 662

17   F.2d 1337, 1344 (9th Cir. 1981).

18          It is true that plaintiff should not have been transferred without his medical chart

19   or, at a minimum, a list of his current medications.  But plaintiff has provided no evidence that

20   Dr. Duc was aware plaintiff was being transferred on November 21, 2005, or was aware plaintiff

21   was placed on the transport bus without these items.  The Health Care Transfer Process does not

22   require the PCP to ensure these items are on the transport bus.  It appears this was the

23   responsibility of the R&R RN and/or R&R staff and transportation staff.  (Dkt. No. 23-3.)

24          Plaintiff argues that he has demonstrated a controversy exists about the conclusive

25   analyses as to why plaintiff's retina detached because Dr. M. Mani, Dr. N. Mani, and Dr. Parks

26   offer various possible causes for the detachment.  (Dkt. No. 59-1 at 3.)  But defendants are not

1  required to prove what caused plaintiff's subsequent retinal detachment.  Defendants have

2  provided expert opinions that childhood trauma[8] and cataract surgery can predispose patients to

3  suffer retinal detachments.  Defendants have provided expert opinions that plaintiff suffered from

4  lattice degeneration, and that he had thin areas with multiple retinal holes and tears in both eyes,

5  predisposing him to a second retinal detachment.  Moreover, Dr. M. Mani opined that plaintiff's

6  second detachment was specifically caused by PVR, which occurs slowly, usually months after

7  the initial surgery.  Plaintiff has failed to rebut this evidence with probative evidence that it was

8  the transfer, not these medical conditions, that caused his second retinal detachment.

9          Plaintiff has also failed to rebut Dr. Park's expert opinion that plaintiff received

10  comparable medical care at Calipatria State Prison, and any minor differences in treatment were

11  not remarkable.  (Dkt. No. 54-5 at 76, 81-82.)  Dr. Park stated that the surgeries plaintiff needed

12  and the outcomes of plaintiff's surgeries were reasonable.  (Id.)  Dr. Park added:

13          it's unfortunate but there are some patients, whether inmates or not
           inmates, that we do the surgery and we fix detachments[,] and they

14          don't always end up with good vision. . . .

15  (Id.)  In addition, it is undisputed that it is not uncommon for patients with multiple retinal

16  detachment surgeries to end up with final vision that is not very good.  In light of this unrefuted

17

18          [8]  In plaintiff's statement of disputed facts, plaintiff refers to Andrew P. Schachat, M.D., a
   Professor of Opthalmology for the Johns Hopkins University School of Medicine.  (Dkt. No. 59-

19  1.)  Plaintiff argues that:

20          Doctor Schachat writes in the 2006 Johns Hopkins White Papers,
           that: "Eye injuries, rapid formation of cataracts commonly occur

21          after a penetrating eye injury," not forty one years later as
           defendants conclude, that it was the sole purpose of [plaintiff's]

22          cataracts and early onset of retinal detachments.  (Lara's Orig.
           Files) [Johns Hopkins White Papers], (Defs.' Ex. D [Dr. Park

23          Dep.] 73:20-25.)

24  (Dkt. No. 59-1-2.)  Plaintiff did not provide a copy of Dr. Schachat's article, copies of the pages
   from the Johns Hopkins White Papers, or a citation that would enable the court to review Dr.

25  Schachat's statement in context.  Plaintiff's statement and reference, without more, is
   inadmissible.  But even if the court were to disregard plaintiff's childhood injury as the possible

26  cause of plaintiff's retinal detachment, it would not change the recommended outcome.

26

1  medical evidence, plaintiff has failed to demonstrate defendant Duc's failure to place a medical

2  hold to prevent plaintiff's transfer was responsible for plaintiff's subsequent medical issues with

3  plaintiff's right eye, or that defendant Duc was deliberately indifferent to plaintiff's serious

4  medical needs.

5          For all of the above reasons, plaintiff has failed to demonstrate that plaintiff's

6  transfer violated plaintiff's Eighth Amendment rights.  Given the undisputed facts, no reasonable

7  jury could find that defendants violated plaintiff's Eighth Amendment rights.  Therefore,

8  defendants' motion for summary judgment should be granted.

9  VII.  Qualified Immunity

10         Because the court has found plaintiff's constitutional rights have not been

11 violated, the court need not address defendants' arguments for qualified immunity.

12         IT IS HEREBY RECOMMENDED that defendants' June 30, 2010 motion for

13 summary judgment (dkt no. 54) be granted as to both defendants and this case be closed.

14         These findings and recommendations are submitted to the United States District

15 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

16 one days after being served with these findings and recommendations, any party may file written

17 objections with the court and serve a copy on all parties.  Such a document should be captioned

18 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

19 objections shall be filed and served within fourteen days after service of the objections.  The

20 parties are advised that failure to file objections within the specified time may waive the right to

21 appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22 DATED: January 14, 2011

23

24                                          _____

25                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE

26 lara2523.ms